IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SHEKEYA THOMAS, *et al.*,        )
                                )
        Plaintiffs,             )
                                )
    v.                          )        CASE NO. 2:23-cv-443-RAH
                                )               [WO]
NHS MANAGEMENT, LLC,            )
*et. al.*,                      )
        Defendants.             )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

Plaintiffs are nine black women who work or have worked in health care: Shekeya Thomas, Angelia Williams, Kierra Blue, Keonna Crittenden, Cassandra Westry, Chantel Mayes, Melissa Hobdy, Courtney Love, and Michelle Carswell. In eighteen counts, all brought under 42 U.S.C. § 1981, they allege the actions of their white co-workers created a racially and retaliatory hostile work environment for which their employer, Defendant Florala Health and Rehabilitation, LLC (FHR), is responsible, and that FHR's management consultant, Defendant NHS Management, LLC (NHS), failed to remedy that hostile work environment.

FHR has moved to dismiss eight of the fourteen claims against it (doc. 53) and strike several allegations (doc. 52) from the Plaintiffs' Second Amended Complaint (SAC) (doc. 50), and NHS has moved to dismiss all four claims against it (doc. 54). After full briefing, the motions are ripe for review.

## II. JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the Court must take "the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. But if the facts in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief,'" and the complaint must be dismissed. *Id.* (alteration adopted) (citing Fed. R. Civ. P. 8(a)(2)).

## IV. FACTUAL ALLEGATIONS

Short on a discernable timeline of events, some Plaintiffs allege they began experiencing a hostile work environment at FHR in 2020 and early 2021, but the events giving rise to Plaintiffs' claims in general appear to have occurred from late 2022 to the filing of this lawsuit in July 2023.

According to the SAC, FHR is a senior care facility in Covington County, Alabama. Each Plaintiff except Cassandra Westry—who is a Registered Nurse (RN)—is a Certified Nursing Assistant (CNA), and each of them worked at FHR during the relevant period. Plaintiffs allege their white supervisors and co-workers at FHR regularly uttered racial epithets and racist commentary directly to or near them, assigned them to less desirable and "more physically arduous" assignments (doc. 50 at 12), subjected them to inconsistent workplace rules and standards based on their race, maintained a private group chat "littered with racist commentary about Plaintiffs" (*id.* at 13), afforded white employees better job opportunities and work assignments, and gave black employees fewer overtime opportunities and less shift flexibility.

At some point before the events giving rise to Plaintiffs' claims, although the SAC does not identify when, FHR contracted with NHS for management consulting services to, in part, advise it on "employment and other human resource related matters." (Doc. 50 at 8.) Plaintiff Keonna Crittenden alleges she reported complaints of racially discriminatory conduct at FHR to NHS representatives in January 2023. Plaintiff Kierra Blue purportedly did the same in February 2023, as well as Shekeya Thomas and Angelia Williams in April 2023. Plaintiffs generally allege that NHS was obligated to engage with FHR management generally about compliance with federal anti-discrimination laws, and with the specific Plaintiffs, as third-party beneficiaries, who directly reported allegations of a "discriminatorily abusive work environment" at FHR to NHS corporate representatives. (*Id.*)

Plaintiffs aver NHS "had actual knowledge of discrimination complaints lodged at multiple points during 2023 and has failed to conduct any meaningful investigation of the conditions at [FHR], despite its contractual relationship to render human resources and employment consulting to [FHR]." (*Id.* at 27.) Thomas, Williams, Blue, and Crittenden each individually allege NHS "took no steps to remedy or alleviate the discriminatory conduct, resulting in the continuation of the" conduct they complained of, to each of their individual detriment. (*Id.* at 40–42.)

In Counts I–IX, each plaintiff claims FHR subjected her to a racially hostile work environment. In Counts X, XI, and XIII, Thomas, Williams, and Crittenden, respectively, claim FHR subjected each of them to a retaliatory hostile work environment. In Count XII, Blue claims FHR retaliated against her. Crittenden, in Count XIV, claims FHR subjected her to retaliatory termination. Finally, in Counts XV–XVIII, Thomas, Williams, Blue, and Crittenden claim NHS failed to remedy the hostile work environment at FHR. Plaintiffs seek injunctive relief, a court order directing the Defendants to remedy their alleged discriminatory and retaliatory employment practices, and monetary damages.

## V. DISCUSSION

The Court will first dispose of FHR's motion to dismiss, then NHS's motion to dismiss, and finally FHR's motion to strike.

### A. FHR's Motion to Dismiss

Contrary to FHR's request, the Court will not dismiss the SAC in total for the Plaintiffs' failure to adhere to the Court's previous order (doc. 48) instructing the Plaintiffs to replead with facts and claims for relief supporting each Plaintiff's individual claims—as is customary in multi-plaintiff § 1981 actions such as this one. *E.g., Washington v. Util. Trailer Mfg. Co.*, No. 1:13-cv-610, 2014 WL 2831189, at *5 (M.D. Ala. June 23, 2014). One would strain to call the SAC an artful pleading, but Plaintiffs amended their complaint and seemingly attempted to comply with the

Court's order.  Their individual claims stand or fall on their allegations as pled in the SAC.

### 1. Racially Hostile Work Environment Claims

FHR seeks to dismiss the racially hostile work environment claims Thomas, Blue, Westry, Mayes, Hobdy, Love, and Carswell bring against it.  FHR does not move to dismiss Williams's (Count II) and Crittenden's (Count IV) claims.[1]

Plaintiffs claiming a hostile work environment under § 1981 must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  *See also Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that Title VII and § 1981 hostile work environment claims have the same elements and are subject to the same analytical framework)).

Where a hostile work environment claim is based on race, a plaintiff must prove five elements: (1) she belongs to a protected group; (2) she has been the subject of unwelcome racial harassment; (3) the harassment was based on her race; (4) "the harassment was severe or pervasive enough to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment"; and (5) "the employer was responsible for such environment under a theory of vicarious or direct liability." *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248–49 (11th Cir. 2014).  "The fourth element requires a plaintiff to show that his work environment

---

[1] FHR argues Crittenden's racially hostile work environment claim should be dismissed with that of five other Plaintiffs because their factual allegations did not change between the SAC and the First Amended Complaint and because they fail to state a plausible claim under the relevant legal framework.  (Doc. 53 at 24.)  But nowhere in its briefing does FHR move to dismiss Count IV, Crittenden's racially hostile work environment claim.  Absent such a motion, the Court will not dismiss Count IV.

is both subjectively and objectively hostile." *Id.* at 1249.  On the one hand, a plaintiff must "subjectively perceive the harassment as sufficiently severe [or] pervasive to alter the terms [and] conditions of employment." *Id.* (citation and quotation marks omitted).  And on the other hand, the objective severity component is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (citation and quotation marks omitted).

The Supreme Court's *Harris* factors guide courts when they consider the objective hostility of a work environment: 1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct "is physically threatening or humiliating, or a mere offensive utterance;" and (4) whether the conduct "unreasonably interferes with the employee's job performance." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997) (citing *Harris,* 510 U.S. at 23).  In light of those factors and the fact-intensive nature of the analysis, courts "ask whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive to alter the terms or conditions of the plaintiff's employment." *Adams*, 754 F.3d at 1251.

The "mere utterance of an ethnic or racial epithet," even when directly aimed at the plaintiff, is not sufficient.  *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971).[2]  Conversely, "environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers" can create the requisite level of hostility, even where the plaintiff is not the direct subject of the harassment.  *Id.*  "The fact that many of the epithets were not directed at [the plaintiff] is not determinative." *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 n.2 (11th Cir. 1982).  But the plaintiff must have been aware of the epithet during her employment.  *See Adams*, 754 F.3d at 1245, 1257–58 (setting

---

[2] The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

forth requirements for the admissibility of *me too* evidence to prove that a work environment is objectively hostile).

FHR argues rather strenuously that many of Plaintiffs' allegations lack a direct connection to any one Plaintiff because they are "unattributed contentions of 'all-encompassing discrimination'" (doc. 53 at 13) and the Court should therefore disregard them on the basis of improper pleading.  It goes on to argue that the individual allegations many Plaintiffs raise fail to show "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment."  (*Id.* at 16 (quoting *Adams*, 754 F.3d at 1248).)  FHR does not directly or meaningfully dispute that Plaintiffs belong to a protected group, that the alleged harassment was based on race, and that it—as the employer—was responsible for the alleged hostile work environment under a theory of vicarious or direct liability.  Plaintiffs predictably argue that they alleged facts sufficient to clear the *Iqbal/Twombly* pleading hurdles.

The allegations, taken as true, support a "reasonable inference" that the workplace at FHR was "permeated with discriminatory intimidation, ridicule, and insult[.]"  *See Phifer v. Hyundai Power Transformers USA*, 522 F. Supp. 3d 1102, 1109–10 (M.D. Ala. 2021).  According to the SAC, black employees, as compared to white employees, were routinely assigned less desirable, more difficult work assignments and shifts, and were passed over for job opportunities based on their race.  Each Plaintiff, aware of the behavior in the workplace during her employment regardless of whether it was directed specifically at her, worked while her white co-workers shouted racial epithets and made personal race-based remarks—even going so far as to pull a black employee's hair to criticize her—and Plaintiffs' white supervisors looked the other way, before and after some of them reported the behavior and unequal treatment.  Each Plaintiff alleged facts showing she subjectively perceived the harassment as sufficiently severe and pervasive to alter

the terms or conditions of her employment, and that an objectively reasonable person in Plaintiffs' position would conclude the same based upon the facts alleged.[3]   Even so, each plaintiff must still show she, individually, was the subject of that unwelcome harassment for her claim to survive FHR's motion to dismiss.  *Adams*, 754 F.3d at 1248–49.

### a. Count I Shekeya Thomas

Thomas alleges that she experienced a hostile work environment at FHR during her employment from November 2022 to May 2023.  She avers that she "experienced first hand a higher ranking white employee using a racial slur in her presence to describe black employees at [FHR] in or about December 2022"; she "personally observed and heard through the accounts of black co-workers that racial slurs directed at African-American employees were common, that black employees were relegated to work specific sections of the nursing home, and that black employees were singled out for unfair disciplinary treatment"; and "[i]n early 2023, Thomas became aware of neglect of an African-American resident by white employees whom she knew to harbor racial bias towards blacks, based on these prolific use of racial slurs" in the workplace.  (Doc. 50 at 32.)  More specifically, Thomas recounts an incident on December 9, 2022, when she "observed two white CNAs . . . falsely accusing two Plaintiffs, Williams and Crittenden, of failing to perform tasks assigned to them during their shift."  Demanding one of the Plaintiffs needed to work extra hours—which resulted in an argument among the group—one of the white employees, enraged by the situation, called the Director of Nursing and said, "You've got to be kidding me.  I have to work short every night and those

---

[3] FHR contends that the Court should disregard Paragraphs 49 and 133 of the SAC, "and other similarly vague paragraphs" because they are "vague, conclusory allegation[s], omitting any detail or actual comparison between specified employees."  (Doc. 53 at 10–13.)  Even absent those and similar allegations, the SAC sets forth sufficient facts, read together and based on the totality of the circumstances, that plausibly allege the workplace was polluted with racial animus.

motherfucking n****** have three down here!" (Doc. 50 at 15.) After the incident, Thomas allegedly built a support network for black staff on site to share their experiences working at FHR. (*Id.*) At some point during her employment, although the SAC does not specify when, "Thomas learned that a white staffer . . . was overheard saying Thomas was a 'troublemaker' who had ties to activists in the local NAACP chapter." (*Id.* at 16.) And after she formally complained to FHR about racial discrimination in the workplace—more to come on these allegations later— Thomas "was immediately subjected to unfavorable scheduling assignments and in April 2023, received an unwarranted disciplinary writeup . . . [which] might have dissuaded a reasonable employee from opposing discrimination in their workplace." (*Id.* at 38.)

Thomas's hostile work environment allegations rely solely on inappropriate comments and mere offensive utterances she overheard or heard second-hand, but she does allege she was subject to adverse consequences for opposing race-based mistreatment in the workplace. The line between hearsay and *me too* statements is a fine one resting on a "fact-intensive, context-specific inquiry" that most often occurs at a later stage in litigation. *See Adams*, 754 F.3d at 1250, 1257–58. Thomas does not allege she personally experienced direct verbal or physical race-based mistreatment, but at least some of those overheard or second-hand comments are specifically about her and she was allegedly the subject of unfavorable treatment for speaking out. The Eleventh Circuit has allowed *me too* evidence to support a hostile work environment claim under some conditions, for example, to prove the intent of the supervisory chain to discriminate and retaliate against black employees who complained about racial discrimination. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008) ("[I]n some cases, 'this testimony goes directly to the issue of racial harassment on the job.'") (quoting *Busby v. City of Orlando*, 931 F.2d 764, 785 (11th Cir. 1991)). Although the Court is skeptical that Thomas can sustain

her claim based upon her mere presence in the purportedly toxic workplace at FHR, it is too soon to say she cannot because her allegations support a reasonable inference that FHR "permitted a severe and pervasive atmosphere of racial discrimination on its premises," *id.*, under which she suffered race-based mistreatment.  Thomas has alleged facts sufficient to clear the pleading hurdles, and her claim will therefore survive for the time being.

### b. Count III Kierra Blue

Blue alleges that during her employment from June 2022 to about March 2023 she "routinely heard the use of racial slurs from white coworkers and higher ranking employees, including one instance where a racial slur was used in reference to her mother, Plaintiff Westry; received unwarranted discipline by white supervisors; [was] segregated in one work area because of her race; and was confronted by a white supervisor in a physically threatening manner." (Doc. 50 at 33.)  More specifically, she alleges "she heard frequent references to the 'slave girls' and 'these black girls,' and heard the term 'n*****' directed at Blue's mother, Cassandra Westry"; "was confined to working on Hall 2 and Memory Hall because of her race"; and "was often berated" by a white supervisor "for taking excessive breaks while white CNAs were frequently allowed lax break schedules including permission to leave the facility to run personal errands[.]" (*Id.* at 20.)

According to the Plaintiffs generally, both Hall 2 and Memory Hall are the least desirable work assignments at FHR because they require more effort than Hall 1.  Hall 2 is "more physically and mentally demanding than" Hall 1 because it "houses less self-sufficient residents who require more care and attention" and has a high resident-to-CNA ratio. (*Id.* at 6–7.)  By Plaintiffs' account, "Memory Hall is an intensely challenging work environment" because "its residents suffer from dementia, Alzheimer's, or other cognitive illnesses, [so they] cannot care for

themselves, and their behavior can veer from depressive to threatening to verbally abusive." (*Id.* at 7.)

Blue's individual hostile work environment allegations show, or least support a "reasonable inference" above speculation, that she was directly subject to ongoing unwelcome workplace harassment based on her race so severe or pervasive that her white supervisors confined her to a more arduous work setting than her white peers, was subject to inconsistent or disparate workplace rules based on her race, and did so in an environment permeated with utterances of racial epithets and race-based confrontation.  She therefore has stated a plausible hostile work environment claim.

### c. Count V Cassandra Westry

Westry alleges that from February 2021 to April 2023 she "observed and heard through the accounts of black coworkers repeated examples of unfavorable treatment and bullying of black employees, and learned of her daughter Plaintiff Blue's physically threatening encounter with a white supervisor." (Doc. 50 at 34–35.)  Westry avers that she tried to engage FHR senior leadership "in an effort to address the persistence of racial preferential treatment and bullying that she observed and learned about from black CNAs[,]" including "reports of a physically threatening encounter" between a white co-worker and her daughter, Blue, to no avail. (*Id.* at 22–23.)  She resigned in April 2023, "particularly demoraliz[ed]" from the "deeply stressful" employment experience. (*Id.* at 23.)

Westry's individual allegations rely on second-hand, or hearsay, accounts of racial mistreatment at FHR and she does not allege what, when, or by whom the behavior she observed or personally experienced subjected her to unwelcome harassment nor specifically what *me too* allegations would support her claim.  Her central allegation appears to be that she reported race-based behavior she was told about to FHR leadership, which went ignored.  Again, a threadbare allegation such as this without more detail cannot raise her claim from speculative to plausible.  Nor

can the Court draw a reasonable inference from Westry's individual allegations that FHR is liable for the conduct she vaguely alleges. The allegations about her daughter are troubling, but her dismay over those events and the allegations of other plaintiffs alone cannot plausibly support her own hostile work environment claim. Because Westry has not alleged facts sufficient to show she was *individually* subject to unwelcome harassment based on her race that was so severe or pervasive as to alter the terms or conditions of her employment, her claim remains too vague and speculative to proceed. The Court will dismiss Count V.

### d. Count VI Chantel Mayes

According to Mayes, "[d]uring at least the period 2022 up to the filing of" the original complaint in this case in July 2023, she "has routinely heard the use of racial slurs from white coworkers and higher ranking employees, and experienced an effort to reassign her to a specific work area because of her race." (Doc. 50 at 35.) Mayes was purportedly "one of the few black CNAs regularly assigned to work in Hall 1"— the more desirable resident hall to work in—but she "learned in early 2023 that [her white supervisor] was actively seeking to have her reassigned to create a slot in Hall 1 for a white employee." (*Id.* at 23–24.) The Hall 2 supervisor "openly stated in Mayes' presence his disdain for African-American employees." (*Id.* at 24.) Mayes alleges she "has heard the same litany of racist remarks" that the other Plaintiffs recount, "including a recurring observation that African Americans are generally predisposed to 'servant' positions." (*Id.*)

Mayes relies on inappropriate comments and mere offensive utterances— some of which may be hearsay, and others of which may amount to *me too* evidence later—as well as a purported attempt to reassign her to a less desirable work setting. She, however, does not allege that she actually was reassigned. Mayes was present in a toxic workplace and although her individual allegations are thin, they

demonstrate a plausible claim for relief above the speculative level. FHR's motion to dismiss Count VI will be denied.

### e. Count VII Melissa Hobdy

During the period from February 2023 to July 2023, Hobdy avers she "was physically attacked with a handmade weapon by a white patient who expressed openly racist views" and "[d]espite its knowledge that the aforementioned patient has a history of virulent racist views, [FHR] assigned [Hobdy] to this individual's care and even after she reported the attack, still continued to require her to render care to him." (Doc. 50 at 36.) According to Hobdy, the assault took place on April 14, 2023, and the white patient used a "handmade shank[.]" (*Id.* at 24.) "Multiple white staffers observed the episode and did not act to intervene. Hobdy reported the attack to her supervisors but has still been required to render care to her attacker." (*Id.* at 25.)

Disturbing as Hobdy's allegations are, FHR is correct that it is not responsible for the tortious actions of a patient under a theory of race-based hostile work environment because the patient is not an FHR agent. But as Hobdy's allegations read, she appears to allege that her FHR supervisors intentionally required her to continue caring for a patient with known "virulent racist views" even after he attacked her with a "shank," inferring such an assignment was racial harassment so severe or pervasive as to alter the terms and conditions of her employment. The allegations support a plausible inference that FHR could be responsible for the conduct Hobdy alleges, raising her claim above the speculative level. Accordingly, FHR's motion to dismiss Count VII will be denied.

### f. Count VIII Courtney Love

Love alleges that during her employment with FHR, specifically in the period between February 2023 and "a date in or around May 2023," she "learned from workers of the frequent use of racial slurs by white coworkers and supervisory

figures and observed the physical segregation of black employees to particular work areas." (Doc. 50 at 36.) "In April 2023, Plaintiff Love heard derogatory references to black workers as 'slaves' and was taunted by white coworkers with racist references to slavery, and observed that a higher ranking white employee who heard the exchange failed to intervene." (*Id.* at 37.) "In late April 2023, Love heard [a white CNA] dismissively suggesting that members of the black nursing staff were neglecting their job responsibilities. [The white CNA] remarked that 'These black girls need to service their people like the slaves they are,' or something similar." (*Id.* at 25.) Later the same day, another white CNA "tauntingly asked Love 'I'm wondering when you're going to come and give me some service.'" (*Id.* at 26.) When Love responded to the comment, the white CNA retorted, "Don't you understand English?" (*Id.*) "The head nurse on duty, a white male, witnessed the exchange and took no action to intervene." (*Id.*) Love resigned shortly after the incident in May 2023. (*Id.*)

Like Thomas and Mayes, Love relies on inappropriate comments and mere offensive utterances she overheard or heard second-hand from black co-workers, but she also directly experienced a white co-worker verbally harassing her based on her race. It may well be that Love cannot support this claim at a later stage of litigation, *see Cooper v. Jefferson Cnty. Coroner and Med. Exam'r Off.*, 861 F. App'x 753, 759 (11th Cir. 2021) (per curiam) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."), but again she has sufficiently alleged a plausible claim. FHR's motion to dismiss Count VIII will thus be denied.

### g. Count IX Michele Carswell

Carswell alleges that "[d]uring a period of time at least from 2022 to May 2023, [she] heard employees repeatedly use racist language, and she was subjected

to unwarranted discipline by a white supervisor." (Doc. 50 at 37.)  In April 2023, Carswell was disciplined "for bringing a cup of tea to the nurses' station, the kind of minor infraction for which white nurses were not disciplined," and she thereafter complained to FHR of unfair treatment.  (*Id.* at 26.)  In May 2023, FHR fired Carswell claiming, "she was a 'no-call-no-show.'" (*Id.* at 27.)   According to Carswell, she "had reported her projected absence from work." (*Id.*)

Here again, Carswell, like Thomas, Mayes, and Love, relies on what may amount only to hearsay or potentially some *me too* evidence later, but she also identifies at least two circumstances when FHR supervisors singled her out and treated her differently than her white co-workers based upon her race.   And FHR ultimately fired her.  Carswell's allegations support a reasonable inference that she was the subject of unwelcome harassment based upon her race, and that harassment was so severe or pervasive to alter the terms and conditions of her employment for which FHR is or could be responsible.  *See Adams*, 754 F.3d at 1248–49; *Iqbal*, 556 U.S. at 678.  She has stated a plausible hostile work environment claim.

*2. Retaliatory Hostile Work Environment Claims*

Of the five § 1981 retaliation claims against it, FHR seeks only to dismiss Thomas's claim, Count X.

To state a claim of retaliation under § 1981, a plaintiff must show that (1) she "engaged in a statutorily protected activity;" (2) she "suffered an adverse employment action;" and (3) she "established a causal link between the protected activity and the adverse action." *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).   Adverse employment actions "consist of things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone." *Monaghan v. Worldplay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam).   But "mistreatment based on retaliation for protected conduct—for

example, making or supporting a charge of discrimination—is actionable whether or not the mistreatment rises to the level of a[n adverse] employment action, but only if the mistreatment 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 861 (*quoting Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *accord Tonkyro v. Sec., Dep't of Veterans Affairs*, 995 F.3d 828, 836 (11th Cir. 2021). This "retaliation standard protects employees more broadly—and is more easily satisfied—than the standard applicable to claims of discrimination." *Monaghan*, 955 F.3d at 861.

In Count X, Thomas alleges she "engaged in protected activity by reporting to officials at [FHR] in February 2023 that black employees and one black patient were subjected to discriminatory treatment." (Doc. 50 at 37.) After formally complaining, "Thomas was immediately subjected to unfavorable scheduling assignments and in April 2023, received an unwarranted disciplinary writeup . . . [which] might have dissuaded a reasonable employee from opposing discrimination in their workplace." (*Id.* at 38.) More specifically, "in February 2023" Thomas met with a FHR human resources representative to report a "patient mistreatment incident and other discriminatory incidents the black nursing staff had shared" with her. (*Id.* at 16.) Thomas then requested a meeting with the FHR Director of Nursing who allegedly refused to meet with Thomas to hear her concerns. (*Id.*) "Soon after the meeting [with human resources], Thomas saw her schedule was changed, which interfered with her ability to get her children to school." (*Id.*) Thomas then traded her shift with a co-worker, a common practice at the facility, "and was immediately admonished by [the Director of Nursing] for changing her hours without supervisor permission." (*Id.*) "There is no indication" that FHR investigated Thomas's complaints onsite, so she "escalate[d] her reporting to NHS'[s] corporate headquarters on or about April 20, 2023[,]" but "NHS took no step to follow up[.]" (*Id.*) In April 2023, "within two months of her meeting with senior onsite official

16

regarding discriminatory conduct at [FHR], Thomas received the first disciplinary write-up in her nursing career based on unsubstantiated complaints involving patient care." (*Id.* at 17.) She resigned on May 9, 2023. (*Id.*)

FHR takes the position that Thomas has failed to allege she suffered an adverse employment action she otherwise would not have suffered "but for" her alleged protected activity. (Doc. 53 at 28.) It argues that FHR's alleged failure to investigate Thomas's report of racial discrimination, its disciplinary writeup of Thomas after she reported the alleged discrimination, and unfavorable schedule changes are not adverse employment actions that can support her claim, "even under the less strict retaliation standard." (*Id.* at 29–30.) Thomas responds by arguing all she need do to state a claim here is plead facts above the speculative level that she suffered mistreatment based on protected activity, and that the mistreatment "well might have dissuaded" a reasonable person from engaging in protected activity.

Here too, Thomas's claim may not hold water at a later stage of this litigation, but she has plausibly stated (1) that she engaged in protected activity when she reported racial discrimination in the workplace to FHR (2) which immediately resulted in a disciplinary write-up and verbal admonition from a white supervisor and unfavorable schedule changes that interfered with her daily tasks and might well dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) the disciplinary actions and unfavorable schedule changes were causally linked to her report of racial discrimination to FHR. Evidence, or lack thereof, at summary judgment may well spell demise for Thomas's claim, but for now she may proceed. FHR's motion to dismiss Count X will be denied.

## B. NHS's Motion to Dismiss

NHS moves to dismiss all four failure-to-remedy claims against it, Counts XV–XVIII. Thomas, Williams, Blue, and Crittenden allege that each of them "as a third party beneficiary of the [human resources] consulting contract [between FHR

and NHS], reported complaints of racially discriminatory conduct at [FHR] to NHS[,]" which NHS "took no steps to remedy or alleviate . . . resulting in a continuation of the . . . discriminatory practices" alleged in the SAC, to each of their individual detriment.  (Doc. 50 at 40–42.)  Thomas and Williams allege they complained to NHS in April 2023, Blue did in February 2023, and Crittenden did in January 2023.  (*Id.*)

Although NHS seeks dismissal for several independent reasons, its motion will be granted because a review of Plaintiffs' allegations and the contract between NHS and FHR show Plaintiffs are neither parties to nor intended third-party beneficiaries of that contract.

In Alabama, "to recover as a third-party beneficiary, the claimant must show: (1) that the contracting parties intended, *at the time the contract was created*, to bestow a *direct* benefit upon a third party; (2) that the claimant was the intended beneficiary of the contract; and (3) that the contract was breached."  *Bernals, Inc. v. Kessler-Greystone, LLC*, 70 So. 3d 315, 320 (Ala. 2011) (cleaned up) (emphasis in original).  Courts first look to the text of the contract to evaluate the directness and intentionality of the benefit the parties contemplated, but where the text is ambiguous the Court may look to the surrounding circumstances.  *H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So. 2d 18, 24 (Ala. 2002); *Holley v. St. Paul Fire & Marine Ins. Co.*, 396 So. 2d 75, 80 (Ala. 1981).

NHS contends the Court need look no further than the text of the contract. It argues Plaintiffs are suing it "for failing to do something NHS has no right or obligation to do under the contract[,]" and "Plaintiffs are, at best, incidental beneficiaries" under the contract.  (Doc. 54 at 21.)  Plaintiffs respond by arguing that because the contract lacks an explicit provision stating it does not confer rights or benefits on any third party, the operative provision, Paragraph 14(a), is ambiguous. Thus, in Plaintiffs' view, the Court should look to NHS's actions after the Plaintiffs

brought this lawsuit, construe the purported ambiguity against the drafter, and—to the extent the Court need draw inferences—such action is improper at this stage of litigation.  NHS is right.

Plaintiffs argue Paragraph 14(a) is ambiguous, so the Court will start there.  It says, "This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns." (Doc. 54-1 at 8.)[4]  Fair enough.  But any careful reader considers who signed the contract.  FHR and NHS are the only parties to the contract.  (*Id.* at 9.)  Consider then what benefit the contract bestows upon whom.  It says, in relevant part, that NHS "shall provide consulting services to [FHR] in connection with the operation of" its facility "including without limitation . . . employment and other human resources related matters . . . consistent with the consulting needs of [FHR]." (Doc. 54-1 at 4.)  What are the boundaries or limitations of those employment and human resources consulting services?  Well, NHS "shall have no responsibility for the supervision and direction of employees and agents of [FHR] involved in the day to day operations of the Facility, nor shall [NHS] have any responsibility for patient care at the Facility.  [FHR] shall indemnify and hold [NHS] harmless of and from any and all claims arising out of or in connection with the operation of the Facility." (*Id.* at 5–6.)  FHR "shall have sole and exclusive responsibility for the operation of the Facility and the supervision of its employees . . ." (*Id.* at 6.)

The contract is clear.  It never mentions Plaintiffs, places supervision of FHR's employees and agents directly and solely in FHR's hands, and expressly contemplates that FHR shall indemnify and hold harmless NHS for any litigation

---

[4] The parties incorporated by reference the contract between NHS and FHR, and the Court will examine it because, although Plaintiffs did not attach it to their SAC, NHS attached it to its opening brief and it is referenced in Plaintiffs' operative complaint, is central to Plaintiffs' claims, and is of undisputed authenticity. *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020).

arising out of FHR's operations—such as this lawsuit. The Court need not look further. The services NHS provided to FHR were for FHR's sole benefit as a business entity. Any benefit Plaintiffs may have received from NHS's services to FHR were incidental to the pair's contract, not a direct benefit to Plaintiffs under the contract. Counts XV–XVIII are thus due to be dismissed.

## C. FHR's Motion to Strike

FHR moves to strike Paragraphs 2, 53, 56, 63, and the first sentence of Paragraph 55 from the SAC pursuant to Federal Rule of Civil Procedure 12(f).

Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). While a court has broad discretion when deciding a Rule 12(f) motion, "the striking of a pleading is an extreme measure and such motions are 'viewed with disfavor and infrequently granted.'" *Stewart v. Argos Ready Mix, LLC*, No. 3:16-CV-356-MHT-WC, 2016 WL 7238915, at *2 (M.D. Ala. Nov. 1, 2016) (quoting *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000)). In fact, a court will typically deny motions to strike "unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action. . . . It is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 2007); *see also Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1192 (N.D. Ala. 2019).

As to Paragraphs 2, 53, and 63, FHR argues they are "patently immaterial and impertinent" to Plaintiffs' claims because the experience of residents in the facility does not relate to Plaintiffs' disputed employment relationship with FHR, and they are scandalous. (Doc. 52 at 3–8.) It further argues that the first sentence of

Paragraph 55 and all of Paragraph 56 should be stricken because, although it relates directly to Thomas's personal experience during her employment with FHR, they relate to events that occurred years before the relevant period of this litigation, rendering them "immaterial to these proceedings" and "harmful and prejudicial to FHR." (*Id.* at 9.)  Plaintiffs respond, arguing each of the challenged paragraphs are material and relevant to claims they advance because (1) the analysis of those claims require fact determinations of whether black employees were required to work "in an environment so full of racial animus that it touched even" those patients they cared for while their white co-workers worked in better conditions, (2) mistreatment of black residents by white employees and Thomas's past work experience at FHR's facility in Opp, Alabama is of consequence to Plaintiffs' request for punitive damages, and (3) alleged mistreatment of residents contributed to Thomas's "good faith belief" that she worked in a racially hostile environment.  (Doc. 56 at 4–5.)

The Rule 12(f) burden is high.  FHR is understandably uncomfortable with the challenged allegations, but it cannot be said they have no relation to Plaintiffs' claims or that their inclusion in the SAC is so prejudicial to FHR that they must be stricken.  The parties will both have an opportunity to test the veracity of Plaintiffs' allegations in discovery but striking them from an initial pleading is extraordinary and disfavored.  FHR's motion to strike will be denied.

## VI. CONCLUSION

Accordingly, it is **ORDERED** as follows:

1.      Defendant Florala Health and Rehabilitation, LLC's *Renewed Motion to Dismiss* (doc. 53) is **GRANTED in part and DENIED in part**;

2.      Defendant NHS Management, LLC's *Renewed Motion to Dismiss* (doc. 54) is **GRANTED;**

3.      Counts V, XV, XVI, XVII, and XVIII of Plaintiffs' Second Amended Complaint (doc. 50) are **DISMISSED with prejudice;**

4.    Cassandra Westry and NHS Management, LLC are **DISMISSED** as parties in this case because all claims involving either of them have been dismissed with prejudice;

5.    Counts I, II, III, IV, VI, VII, VIII, IX, X, XI, XII, XIII, and XIV of Plaintiffs' Second Amended Complaint (doc. 50) remain against Defendant Florala Health and Rehabilitation, LLC;

6.    Defendant Florala Health and Rehabilitation, LLC's *Renewed Motion to Strike* (doc. 52) is **DENIED**.

**DONE** on this the 11th day of March 2024.

R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE